# In the United States Court of Federal Claims

### OFFICE OF SPECIAL MASTERS
### No. 20-886V
### Filed: May 17, 2021
### PUBLISHED

| | |
|---|---|
| MARK THOMAS, on behalf of his minor child, Z.T., <br><br> Petitioner, <br> v. <br><br> SECRETARY OF HEALTH AND HUMAN SERVICES, <br><br> Respondent. | Special Master Horner <br><br> Attorneys' Fees and Costs; Reasonable Basis; Good Faith; 240 Notice; Withdrawn Case; Civil Suit Against Vaccine Manufacturer |

*Andrew Donald Downing*, Van Cott & Talamante, PLLC., Phoenix, AZ, for petitioner.
*Jeremy Fugate*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

On July 21, 2020, petitioner, Mark Thomas, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012), alleging that his minor child's July 26, 2017 Gardasil vaccination caused a severe adverse reaction and that the Gardasil vaccine has been connected to autonomic nervous system dysfunction. On March 18, 2021, I issued a notice indicating that the statutory 240-day period for the special master's issuance of a decision in this case had expired. (ECF No. 26.) On March 18, 2021, petitioner filed a Notice of Intent to Withdraw his Petition pursuant to 42 U.S.C. §300aa-21(b) and requested that an order be entered concluding proceedings. (ECF No. 27.) Such order was entered on March 18, 2021. (ECF No. 28.)

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

1

Petitioner now moves for an award of attorneys' fees and costs. For the reasons discussed below, petitioner is awarded attorneys' fees and costs in the amount of $17,228.51.[2]

## I. Petitioner's Claim in This Case

Z.T. received the first dose of the HPV vaccination on July 26, 2017, following a well check at J.F.K. Pediatrics. (Ex. 9, p. 2; Ex. 12, p. 17.) She was assessed with high blood pressure and possible myopia. (Ex. 12, p. 18.) She returned to J.F.K. Pediatrics on August 25, 2017, with complaints of abnormal behavior for over a month, including fatigue, vague joint pains, difficulty sleeping, hallucinations, tingling on her right arm, slowed and stuttered speech, anxiety, and panic attack. (Ex. 12, p. 15.) She was referred to neurology and psychiatry consultation. Z.T. then had a psychiatric evaluation on October 10, 2017, where it was reported that on the first day after receiving the HPV vaccine, petitioner became tired and experienced abnormal, erratic body movements. (Ex. 9, p. 3.) Thereafter, petitioner developed joint pains, eye droopiness, and auditory and visual hallucinations, and about two months following vaccination, Z.T. started falling and collapsing. (Ex. 9, p. 3, 5.) During a follow up appointment with her psychiatrist, Z.T. was diagnosed with bipolar disorder following two psychiatric hospitalizations and it was noted that her "history of brief psychotic episodes [are] consistent with adverse reaction to HPV vaccination." (Ex. 9, p. 7.)

On October 11, 2017, Z.T. had a neurological assessment due to possible seizures that started a week after receiving her HPV vaccination. (Ex. 1, p. 7.) Specifically, she had intermittent episodes of seemingly falling asleep with no response for about 20-30 seconds, and on one occasion collapsed on the floor. Additionally, Z.T. had an EEG, which was normal. (Ex. 1, p. 3.) Z.T. was assessed with unspecified encephalopathy and was noted that "[h]istory is quite unusual due to the close relation to the HPV there is a need for more extensive investigation including NMDA antibodies." (Ex. 1, p. 8.) During a follow up appointment on November 28, 2017, Z.T. was reported to continue collapsing on the floor, but her workup was essentially normal including negative NMDA antibodies and normal EEG. (Ex. 1, pp. 5-6.)

In his petition, petitioner cited, but did not file, medical literature purporting to link autonomic nervous system dysfunction to the HPV vaccine. (ECF No. 1, p. 4.) Some of

---

[2] Petitioner filed an initial motion for an award of attorneys' fees and costs on March 25, 2021, seeking $14,174.00 in attorneys' fees and $1,538.81 in costs. (ECF No. 29.) Respondent filed his response opposing an award of attorneys' fees and costs on April 8, 2021. (ECF No. 30.) On April 9, 2021, I issued an order noting that neither party had addressed the reasonableness of the amount of attorneys' fees and costs and ordered petitioner to address that question in a reply. (ECF No. 31.) Petitioner filed his reply on April 16, 2021, along with a supplemental motion for an additional $4,697.00 in attorneys' fees generated in producing the reply. (ECF Nos. 33-34.) Respondent filed a response to the supplemental motion on April 23, 2021, reiterating substantially the same arguments presented in his initial response. (ECF No. 35.) Petitioner filed no further reply. Accordingly, these motions are now ripe for resolution and are addressed collectively herein.

2

this literature refers to specific conditions such as postural orthostatic tachycardia syndrome ("POTS") and small fiber neuropathy. Other articles purport broadly to identify epidemiologically significant clusters of various post-vaccination symptoms that are potentially consistent with autonomic dysfunction. (*Id.*) Petitioner also filed a Gardasil Product Monograph (referred to herein as a "package insert"). (Ex. 3.) The package insert does not specifically discuss autonomic dysfunction, but does include at least some reference to symptoms such as seizure-like activity, myalgia, arthralgia, headache, fatigue, and suspected autoimmune conditions arising post-vaccination.

## II.  Background Regarding HPV Vaccine/Autonomic Dysfunction Litigation in this Program

Over the last several years, a number of prior decisions from other special masters have addressed and rejected causal theories seeking to link the HPV vaccine to autonomic nervous system dysfunction. *See, e.g., Johnson v. Sec'y of Health & Human Servs.*, No. 14-254V, 2018 WL 2051760 (Fed. Cl. Spec. Mstr. Mar. 23, 2018); *Combs v. Sec'y of Health & Human Servs.*, No.14-878V, 2018 WL 1581672 (Fed. Cl. Spec. Mstr. Feb. 15, 2018); *L.A.M. v. Sec'y of Health & Human Servs.*, No. 11-852V, 2017 WL 527576 (Fed. Cl. Spec. Mstr. Jan. 31, 2017); *Turkopolis v. Sec'y of Health & Human Servs.*, No. 10-351V, 2014 WL 2872215 (Fed. Cl. Spec. Mstr. May 30, 2014). In 2020, I likewise issued a decision that, *inter alia*, rejected a petitioner's assertion of an "HPV syndrome" that could explain a constellation of alleged autonomic symptoms. *Balasco v. Sec'y of Health & Human Servs.*, No. 17-215V, 2020 WL 1240917, at *29-32 (Fed. Cl. Spec. Mstr. Feb. 14, 2020). That determination was based on a complete expert presentation, but also in significant part on the same medical literature petitioner cites in the petition filed in this case. In *Balasco,* I concluded that an award of attorneys' fees and costs was appropriate despite finding against the petitioner. *Balasco v. Sec'y of Health & Human Servs.,* No. 17-215V, 2020 WL 2461911 (Fed. Cl. Spec. Mstr. Apr. 16, 2020) (awarding final attorney's fees and costs). In fact, respondent had previously conceded that the petition in that case was filed in good faith and with a reasonable basis. *Balasco v. Sec'y of Health & Human Servs.*, No. 17-215V, 2019 WL 5691998, at *2 (Fed. Cl. Spec. Mstr. Oct. 8, 2019) (awarding interim attorneys' fees and costs).

Many of these HPV vaccine/autonomic dysfunction petitioners, including Ms. Balasco, were represented by Mr. Andrew Downing, the same counsel that represents Mr. Thomas in this case. Not long after the *Balasco* decision was issued, Mr. Downing began resolving some HPV-related cases via motion to dismiss, explaining that the petitioners in those cases intended to reject the resulting judgment and pursue tort remedies directly against the vaccine manufacturer. *See, e.g., McElerney v. Sec'y of Health & Human Servs.,* No. 16-1540V, 2020 WL 4938429, at *1 (Fed. Cl. Spec. Mstr. July 28, 2020). In *McElerney*, petitioner filed a brief expert report by the same expert that opined in *Balasco*. *Id*. at *2. Despite granting petitioner's own motion to dismiss, I concluded that an award of attorneys' fees and costs was still appropriate. *McElerney v. Sec'y of Health & Human Servs.,* No. 16-1540V, 2020 WL 7366343 (Fed. Cl. Spec.

3

Mstr. Nov. 2, 2020). In that context, respondent noted that I had previously found petitioner's theory unpersuasive in *Balasco* but did not explicitly argue that the petition lacked a reasonable basis. *Id*. at n.4. I noted in effect that the expert presentation in *Balasco* had fallen somewhere below preponderant evidence but above the less exacting standard for a finding of reasonable basis. *Id*.

In this case, petitioner has likewise disclosed his intention to pursue a civil action against the vaccine manufacturer; however, petitioner's specific method of exiting the Program via withdrawal of his petition has prompted respondent to oppose an award of attorneys' fees and costs.

### III. Legal Standard for Availability of Attorneys' Fees and Costs in Withdrawn Cases

In establishing a system for compensation of vaccine-related injuries (herein the "Vaccine Program" or "the Program"), the Vaccine Act provides that "[t]he United States Court of Federal Claim and the United States Court of Federal Claims special masters shall, in accordance with this section, have jurisdiction over proceedings to determine if a petitioner under section 300aa-11 of this title is entitled to compensation under the Program and the amount of such compensation." 42 U.S.C. §300aa-12(a). The Vaccine Act was intended to facilitate compensation by providing "fast, informal adjudication" of no-fault injury claims within the office of special masters in lieu of traditional tort suits against vaccine manufacturers. *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 228 (2011). The "*quid pro quo*" for this path to expedited resolution, however, "designed to stabilize the vaccine market, was the provision of significant tort-liability protection for vaccine manufacturers." *Bruesewitz*, 562 U.S. 229. Accordingly, the Vaccine Act allows only limited avenues for exiting the Program in favor of tort litigation. Typically, adjudication in the Court of Federal Claims and rejection of the resulting judgment is a prerequisite to seeking any other available tort relief. *Id*. at 228; *see also* 42 U.S.C. § 300aa-(11)(2)(A)(i); 42 U.S.C. § 300aa-21(a).

However, owing to the promise of "fast, informal adjudication," section 300aa-12(d)(3)(A)(ii) provides that "[a] special master to whom a petition has been assigned shall issue a decision . . . as expeditiously as practicable but not later than 240 days, exclusive of suspended time under subparagraph (C), after the date the petition was filed." In practice and given current caseloads, resolution of a claim within 240 days is very rare apart from facially defective petitions. However, Section 300aa-12(g) provides in pertinent part that if the special master fails to make a decision on the petition within the prescribed timeframe, then the special master shall "notify the petitioner under such petition that the petitioner may withdraw the petition under section 300aa-21(b)." Section 300aa-11(a)(2)(A)(ii) of the Vaccine Act in turn provides that:

> No person may bring a civil action for damages in an amount greater than $1,000 or in an unspecified amount against a vaccine administrator or manufacturer in a State or Federal court for damages arising from a

vaccine-related injury or death . . . unless a petition has been filed, in accordance with section 300aa-16 of this title, for compensation under the Program for such injury or death and . . . such person elects to withdraw such petition under section 300aa-21(b) of this title or such petition is considered withdrawn under such section.

In this case, petitioner exited the Program via withdrawal pursuant to section 300aa-21(b) with the stated intention of initiating a suit against the vaccine manufacturer. The question presented on this motion is whether attorneys' fees and costs may be paid to a petitioner who exits the Program in this manner.

In effectuating the above-discussed provisions of the Vaccine Act, Vaccine Rule 10(d) states in relevant part that the special master's order concluding proceedings in response to petitioner's notice of withdrawal "upon entry will be deemed a judgment for purposes of 42 U.S.C. § 300aa-15(e)(1)." Section 300aa-15(e)(1) of the Vaccine Act provides that "[i]f the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioner's reasonable attorneys' fees and other costs incurred in any proceeding on such petition if the special mater or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought."

By operation of Vaccine Rule 10(d) and Section 300aa-15 of the Vaccine Act, my order concluding proceedings in this case constitutes a judgment on this petition that does not award compensation. Thus, this case is eligible for reasonable attorneys' fees and costs upon a showing that this petition was brought in good faith and with a reasonable basis.

"Good faith" is a subjective standard. *Hamrick v. Sec'y of Health & Human Servs.*, No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred. *Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). The standard for finding good faith has been described as "very low," and findings that a petition lacked good faith are rare. *Heath v. Sec'y of Health & Human Servs.*, No. 08-86V, 2011 WL 4433646, *2 (Fed. Cl. Spec. Mstr. Aug. 25, 2011).

"Reasonable basis," however, is an objective standard. Unlike the good faith inquiry, reasonable basis requires more than just petitioner's belief in his claim. *See Turner*, 2007 WL 4410030, at *6. Instead, a reasonable basis analysis "may include an examination of a number of objective factors, such as the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018); *accord Cottingham v. Sec'y of Health & Human Servs.*, 971 F.3d 1337 (Fed. Cir. 2020). "More than a mere scintilla but less than a preponderance of proof

5

could provide sufficient grounds for a special master to find reasonable basis." *Cottingham,* 917 F.3d at 1346.

### IV.     Respondent's Opposition

Respondent stresses that in the context of an unsuccessful petition, an award of attorneys' fees and costs is not mandatory and instead within my discretion. (ECF No. 30, p. 3.) However, he suggests that this case lacks both good faith and a reasonable basis and, therefore, "the special master lacks authority to award even a discretionary fees and costs award." (*Id.*)

With regard to good faith, respondent emphasizes the legislative intent behind the Vaccine Act of "divert[ing] litigation over alleged vaccine injuries away from vaccine manufacturers" and having the Vaccine Program "serve as the primary vehicle for resolving vaccine injury claims" in order to "help ensure a robust supply of vaccines." (*Id.* at 3-4.) Respondent contends that the fact that petitioner filed this petition only to comply with the statutory prerequisite to bringing a direct action against the vaccine manufacturer is incompatible with a good faith filing. Specifically, respondent argues:

> Based on the statements filed by petitioner with the court, it is clear that petitioner did not bring this matter before the court in a good faith attempt to adjudicate this case on the merits of the claim, but instead filed this claim as a step towards [his] ultimate goal of bringing a cause of action [against] Merck directly. Thus, petitioner did not intend to litigate this case based on the merits of the claim and fails to have acted in good faith.

(*Id.* at 5.) Respondent further suggests that petitioner "did the bare minimum to comply with the statutory requirement" and that "[a]ttempting to subvert the purpose of the Vaccine Program to bring a cause of action against a third party, while using Program funds to pay for such litigation, is not acting in good faith." (ECF No. 35, p. 6.)

Respondent also argues that petitioner has not met his burden to affirmatively demonstrate that there was a reasonable basis for filing this petition. Specifically, respondent argues that "[t]he records filed by petitioner are substantially incomplete and do not allow for meaningful review by the court or respondent." (ECF No. 30, p. 6.) Respondent notes that he previously filed a status report identifying ten different sets of missing records that were considered necessary for respondent to complete his review.[3]

---

[3] Respondent requested: (1) Cardiologist reports from July 2017; (2) Psychiatric hospitalization records from 2017 to 2018; (3) School records from school years 2016/2017 and 2017/2018; (4) The entire record from the August 26, 2017 visit to John F. Kennedy medical center; (5) Records (if any) from any mental health therapist prior to the date of vaccination; (6) The complete psychiatric evaluation note from the session on October 10, 2017; (7) Nmethyldaspartate receptor antibody ("NMDA") test results and cerebral spinal fluid studies that were referenced by Dr. Flasterstein in visit notes form November 28, 2017; (8) Results from any multiple sleep latency test from 2014 to 2019; (9) Any records pertaining to alleged Guillain-Barre Syndrome from 2014 to 2019; (10) Records pertaining to an autoimmune dysfunction from 2014-2019. (ECF No. 25.)  These requests were described in a joint status report filed by respondent on behalf of the parties in response to my Initial Order. (*Id.*)  Respondent indicated that petitioner was

6

Those records were never filed and respondent contends that petitioner's failure to file all the evidence required by Section 11(c) of the Vaccine Act necessarily means that the petition lacked a reasonable basis. "Since the record was substantially incomplete when the petitioner withdrew the claim [he] cannot establish a reasonable basis for the claim nor could [he] prove entitlement to compensation." (*Id.*) "Without knowing what information is contained in those records, the Special Master cannot simply assume that there is a reasonable basis for petitioner's claim in this case." (ECF No. 35, p. 8.)

In closing, respondent stressed the potential strain on this Program if other petitioners follow a similar approach:

> Congress's inclusion of the objective reasonable basis requirement in Section 15(e) of the Act evinces its intent to encourage petitioners' attorneys to perform fundamental due diligence, and pursue claims that have some basis in fact, science, and law. Enforcement of this intent has become all the more important in recent years as the Program faces an ever-burgeoning docket with limited resources. Each petition that is filed carries transaction costs for both the Program and the court. With a statutorily-limited number of Special Masters, the time and resources that must be devoted to disposing of cases with no reasonable basis that are brought before the court lacking good faith – cases which petitioner never intended to litigate before the court nor completely develop the record– inevitably reduces the court's ability to focus on meritorious claims, and delays compensation in those cases.

(ECF No. 30, pp. 6-7.)

Finally, respondent requests that "[s]hould the Special Master conclude that an award of attorneys' fees is appropriate, then respondent respectfully requests that the Special Master exercise his discretion and determine a reasonable award for attorneys' fees and costs, keeping in mind petitioner's 'apparent intention not to seek a decision on the merits within the Program.'" (ECF No. 35, n.2 (quoting Order of Apr. 9, 2021 (ECF No. 31)).)

V. **Analysis**

a. **Good Faith**

As a threshold matter, although respondent is correct regarding the overarching purpose of the Vaccine Act as diverting vaccine litigation into this Program, respondent has wholly failed to explain how his invocation of that legislative history squares with the actual terms of the Vaccine Act which allow petitioner to do precisely as he has done in this case. Section 300aa-11(2)(A)(ii) of the Vaccine Act explicitly contemplates that a petitioner might pursue a civil action after withdrawing at 240 days rather than rejecting

---

working to respond to the requests and the parties opted not to request an initial status conference. Accordingly, the requests themselves were not subject to any adjudication.

7

a judgment on the merits. Given the availability of the withdrawal mechanism within the statute itself, it is not readily apparent how petitioner has done anything other than comply with the letter of the Vaccine Act or even how petitioner's intentions violate the spirit of the Act. *See, e.g., Soto Galvan v. Sec'y of Health & Human Servs.*, 151 Fed. Cl. 789, 795 (2021) (observing in a different context that the Vaccine Act "must be interpreted as a unified whole"). Although the pace of case resolution within the Program today may tend to create the appearance of prematurity when a petitioner withdraws at 240 days, the issuance of the 240-day notice is a function of the statute and the ultimate timing of that opportunity to withdraw is largely not of petitioner's own choosing.

Moreover, petitioner correctly notes that respondent cites no authority for his interpretation of "good faith" as encompassing an intention to litigate the claim to completion within the Program. (ECF No. 33, p. 4.) Instead, petitioner reasonably argues that the meaning of the good faith requirement is well settled and refers to his belief in the facts underlying his claim – his belief that a vaccine injury occurred – and not his intentions regarding the manner of litigation. (ECF No. 33, p. 5 (citing *Di Roma v. Sec'y of Health & Human Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993).) He disputes that his decision to withdraw is incompatible with his good faith belief that a vaccine injury occurred. I agree. Indeed, petitioner's stated intention to file suit directly against the vaccine manufacturer in a different forum is entirely in keeping with a sincerely held belief that a vaccine-caused injury has occurred.

Given that the collection of medical records occurred after the petition was filed and some records remain outstanding, respondent also argues that petitioner demonstrated a lack of good faith by "doing the bare minimum" to comply with the requirements of the Program before withdrawing. (ECF No. 35, p. 6.) Notably, however, petitioner's counsel's billing records reflect that petitioner first consulted counsel on July 13, 2020. (*See* ECF No. 29-1, p. 1.) The vaccine at issue having been administered on July 26, 2017, petitioner's counsel advised in the petition that this case was being filed promptly to ensure the statute of limitations period did not lapse. (ECF No. 1, n.1.) This circumstance largely, if not entirely, explains respondent's concern regarding petitioner's diligence in collecting medical records.

Attorney conduct – such as acting to prevent the lapsing of the statute of limitation period – cannot confer a reasonable basis for the filing of a petition. *Simmons v. Sec'y of Heath & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017) (explaining that the reasonable basis requirement reflects "an objective inquiry unrelated to counsel's conduct"). Nonetheless, the *Simmons* Court suggested in dicta that a looming statute of limitations period does remain relevant to the good faith inquiry. *Id.* (indicating that "[a]lthough an impending statute of limitations deadline may relate to whether 'the petition was brought in good faith' by counsel, the deadline does not provide a reasonable basis for the merits of the petitioner's claim."). Moreover, the *Simmons*

8

Court expressed agreement with the government's argument in that case, which was noted to include, *inter alia*, the idea that "a looming statute of limitations may excuse an attorneys' ethical duty to investigate a claim prior to filing a Vaccine Act petition." *Id*. at 635.

For all the reasons discussed above, I conclude that this petition was filed in good faith.

### b. Reasonable Basis

In discussing the reasonable basis requirement in *Cottingham v. Sec'y of Health & Human Services* (which itself involved similar allegations relating to the HPV vaccine), the Federal Circuit stressed the *prima facie* petition requirements of section 300aa-11(c)(1) of the Vaccine Act. 971 F.3d at 1345-46. Specifically, the petition must be accompanied by an affidavit and supporting documentation showing that the vaccinee:

> (1) received a vaccine listed on the Vaccine Injury Table;
> (2) received the vaccination in the United States, or under certain stated circumstances outside of the United States;
> (3) sustained (or had significantly aggravated) an injury as set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;
> (4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and
> (5) has not previously collected an award or settlement of a civil action for damages for the same injury.

*Id*.

Consistent with the above, petitioner has filed contemporaneous and facially trustworthy medical records demonstrating: that Z.T.'s received a covered vaccine (namely HPV) (*see* Ex. 9, p. 2); that the vaccine was administered in the U.S. (*Id*.); that Z.T. experienced the symptoms petitioner alleges to constitute a vaccine-caused injury, including signs of seizures, weakness, abnormal gait, collapsing/falling asleep and falling down, abnormal body movement, joint pain, eye droopiness, slurred speech, eyes rolling backwards, altered mental status, and encephalopathy (*see*, *e.g.*, Ex. 1, pp. 5-6; Ex. 4, p. 77; Ex. 7, p. 8, Ex. 8, pp. 17-18; Ex. 9, p. 3); and that these symptoms persisted for at least six months (*see*, *e.g.*, Ex. 7, p. 8). Petitioner has also filed an affidavit averring that there has been no award or settlement of a civil action for damages for the same injury (Ex. 10, p. 2).

Respondent is correct that further records would likely be necessary to ultimately resolve entitlement to compensation on the merits. However, "[t]he burden of proof to establish reasonable basis for attorney fees . . . is lower than the preponderant evidence standard required to prove entitlement to compensation" and "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds

9

for a special master to find reasonable basis." *Cottingham*, 971 F.3d at 1346. Incomplete medical records do not automatically prohibit a finding of reasonable basis. *See e.g. Girardi v. Sec'y of Health & Human Servs.*, No. 17-181V, 2020 WL 7868229, at *3 (Fed. Cl. Spec. Mstr. Dec. 7, 2020) (citing *Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 288 (2014).)

Respondent's motion opposition stresses only the number of his records requests without regard to their significance or likelihood of producing essential records. However, respondent's records requests are not in themselves dispositive as to the adequacy of the record. Indeed, some of the requests may not ultimately produce new information.[4] Some of respondent's requests specifically acknowledge that they are speculative.[5] Some appear vague and/or potentially overbroad.[6] Additional requests are clearly ancillary.[7] For his part, petitioner represents that most of the records requested by respondent do not exist and that respondent's requests were understood by the parties only as seeking verification that additional records did not exist. (ECF No. 33, p. 6.) Notably, none of respondent's records requests identify any specific medical provider from whom records should have been obtained but were not. (ECF No. 25.)

Despite respondent's characterization, petitioner has in fact filed substantial medical records (close to 4,000 pages from eight different medical providers). In fact, this case did complete OSM's Pre-Assignment Review ("PAR") process, which is specifically designed to provide a preliminary screening for records consistent with petitioner's obligations under 300aa-11(c)(1). (*See* ECF Nos. 5, 21.) PAR is only a preliminary process and so the assignment of this case out of PAR is not in itself dispositive. Nonetheless, I have considered all ten of respondent's specific requests. Upon my review, they do not demonstrate the record to be "substantially" incomplete as respondent suggests. (ECF No. 30, p. 6.) In light of what the medical records that have already been filed *affirmatively* evidence, the fact of respondent's records requests alone should not defeat petitioner's demonstration of a reasonable basis in this case. I cannot agree that evaluation of well over 3,000 pages of contemporaneous medical

---

[4] For example, respondent requested NMDA test results, but the records that have already been filed confirm those results were noted to have been negative, (Ex. 1, p. 6).

[5] For example, respondent requests "[r]ecords (*if any*) *from any* mental health therapist prior to the date of vaccination." (ECF No. 25, p. 1 (emphasis added).)

[6] For example, respondent requests "records pertaining to an autoimmune dysfunction from 2014-2019" or broadly request "any" of a certain variety of records without any explanation for why respondent believes such records may exist (*e.g.* "results from any multiple sleep latency test from 2014 to 2019"). (ECF No. 25, p. 2.) These are in contrast to other requests that identify specific appointments or specifically identify the basis for the request. For example, respondent's request for NMDA and CSF study results indicate that these tests were referenced by Dr. Flasterstein on November 28, 2017.

[7] For example, respondent requests school records. (ECF No. 25, p. 1.) Although school records could be informative, they are not medical records required by section 300aa-11(c)(1) of the Vaccine Act.

records would amount to "assuming" that a reasonable basis exists as respondent contends. (ECF No. 35, p. 8.)

Of course, the Federal Circuit has also stressed that "[b]ecause causation is a necessary element of a petition, [petitioner] must point to evidence of a causal relationship between the administration of the vaccine and her injuries in order to establish that a reasonable basis for the claim existed when the petition was filed." *Cottingham*, 971 F.3d at 1346. In that regard, petitioner stresses that there is some treating physician support for his claim contained in Z.T.'s medical records. Petitioner relies on Z.T.'s treating neurologist, who suspected an encephalopathy and noted that "[h]istory is quite unusual but due to the close relation to the HPV there is a need for more extensive investigation including NMDA antibodies," and petitioner's diagnosis of bipolar disorder and brief psychotic episodes that was otherwise noted to be "consistent with adverse reaction to HPV vaccination." (Ex. 1, p. 8; Ex. 9, p. 7.) Moreover, certain of petitioner's alleged symptoms, such as joint pain, fatigue, tingling sensation, and seizures, are not readily dismissed on the basis of her psychological diagnoses. Even at the South County Mental Health Center, Dr. Hartman's assessment of psychosis not otherwise specific ("NOS") also indicated the need to further explore possible medical conditions caused by the HPV vaccine. (Ex. 9, p. 5.)

Additionally, petitioner has filed the package insert for the vaccine at issue. As discussed in *Cottingham*, the Federal Circuit reasoned that the Gardasil package insert, the same insert that has been filed in this case (Ex. 3), does constitute objective evidence potentially supportive of causation when paired with a petitioner's medical records. 971 F.3d at 1346. Here, seizure-like activity (under Warnings and Precautions) as well as fatigue and myalgia (observed in clinical trials at a rate of over 1%) were all described in the package insert and are likewise reflected in petitioner's post-vaccination medical records. (*See*, *e.g.*, Ex. 1, pp. 5-6; Ex. 4, p. 77; Ex. 7, p. 8, Ex. 8, pp. 17-18; Ex. 9, p. 3.) Post-marketing experience also references spontaneous reports of autoimmune conditions, arthralgia and myalgia following vaccination.[8] (Ex. 3, p. 10.)

---

[8] Of note, in *Cottingham* the Federal Circuit decided only that the special master was wrong to characterize the record as containing "no evidence" to support a reasonable basis. 971 F.3d at 1347. The Federal Circuit explicitly declined to weigh the evidence of record and remanded the case to the special master for further consideration. *Id.* On remand, the *Cottingham* special master addressed at length further arguments by the parties as well as the evidentiary value of the vaccine manufacturer package insert and maintained the view that the record as a whole in that case did not support a reasonable basis. No. 15-1291V, 2021 WL 347020 (Fed. Cl. Spec. Mstr. Jan. 7, 2021). As of this writing, a further motion for review is pending and the ultimate resolution of attorneys' fees and costs in *Cottingham* remains unresolved. This decision should not be viewed as disagreeing with the substantive analysis of the *Cottingham* special master with regard to the limitations of the package insert as a piece of evidence. In this case, however, respondent's opposition raises only the completeness of the record at the time of withdrawal in his challenge to reasonable basis and does not discuss at all the value of the package insert. Moreover, the package insert is not the sole piece of evidence in either case.

11

Also of note, in the context of this specific combination of vaccine and alleged injury, prior decisions have addressed the alleged causal relationship at issue with the benefit of complete expert presentations, lending further clarity to the reasonable basis analysis in this case. *See Amankwaa*, 138 Fed. Cl. at 287 (noting that in a totality of circumstances assessment when determining reasonable basis, the special master may consider several factors including scientific understanding of the vaccine and its potential consequences, and the availability of experts and medical literature); *see also Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). For example, in *Balasco*, although petitioner did not provide preponderant evidence to support her claim of a syndrome of HPV-related autoimmune autonomic dysfunction, petitioner did come forward with expert opinions and I did explain that there is some medical literature exploring the idea that there may be an autoimmune explanation for autonomic dysfunction following HPV vaccine.[9]   *Balasco v. Sec'y of Health & Human Servs.*, No, 17-215V, 2020 WL 1240917 (Fed. Cl. Spec. Mstr. Feb. 14, 2020).

Although this case is inchoate at best and the ultimate value of the above-discussed pieces of evidence could be fairly subject to challenge, respondent opted not to address the underlying facts of petitioner's medical history or the nature of petitioner's allegations regarding vaccine causation. Nor has respondent sought to distinguish this case from prior HPV/autonomic dysfunction cases in which attorneys' fees and costs were reimbursed. Instead, respondent focuses his opposition strictly on the completeness of the medical records. Notably, however, it is not unusual for special masters to be called upon to resolve questions of reasonable basis in the context of cases cut-short by voluntary dismissals. In that regard, prior cases addressing reasonable basis have stressed the need to focus on the feasibility of a claim rather than weighing the evidence of record. *E.g. Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018) (finding that the special master erred because she "appears to have engaged in weighing the evidence of petitioner's claim rather than deciding if the claim was feasible.); *accord Cottingham*, 971 F.3d at 1346 (explaining that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis.").[10]

---

[9] This most notably included research exploring the hypothesis that adrenergic and cholinergic receptor antibodies may play a role in the pathogenesis of orthostatic intolerance, but also some literature specifically addressing the NMDA receptor antibodies referenced by this petitioner's treating neurologist (though petitioner was ultimately negative for NMDA antibodies). *Balasco* touched on a number of separate conditions, including POTS, orthostatic intolerance, fibromyalgia, and small fiber neuropathy, as well as an epidemiologically based "HPV Syndrome" that sought to explain a constellation of autonomic symptoms.

[10] Little is available that directly characterizes the term "feasible" beyond referring back to the requirements of the Vaccine Act. *See, e.g. Vandergriff v. Sec'y of Health & Human Servs.*, No. 18-919V,

In this case additional evidence would clearly be needed if this case continued, including an expert opinion more fully addressing the nature of petitioner's alleged autonomic dysfunction and theory of causation. However, in the context of this allegation relative to this vaccination, petitioner's medical records documenting reports of onset of symptoms occurring in temporal proximity to vaccination along with a suspicion of vaccine-causation by her treating physicians, and further coupled with the vaccine manufacturer package insert, suggest that it would have been feasible for petitioner to pursue her claim further in this Program with the aid of expert opinion. That is, especially in the absence of any specific argument to the contrary, it appears that petitioner has presented "more than a mere scintilla of evidence" relating to causation.

Thus, in light of all of the above, I find that petitioner has demonstrated a reasonable basis for the filing of this petition.

### c. Respondent's Policy Argument Regarding Program Resources

In the conclusion of his opposition to petitioner's motion, respondent also stresses the potential strain on Program resources created by petitioner's handling of this case as a "stepping stone" to a tort suit. Respondent discusses this issue not only in terms of the instant case, but also in terms of other cases that may be similarly situated ("cases which petitioner never intended to litigate before the court nor completely develop the record"). (ECF No. 30, pp. 6-7.) In his response to petitioner's supplemental motion, respondent further argues, despite making no substantive arguments with respect to petitioner's own medical history, that "[f]inding reasonable basis and good faith in this case only thwarts the Program's goals and delays compensation in those cases where petitioners intend to develop the record and litigate their cases on the merits." (ECF No. 35, p. 9.) The tenor of respondent's entire response to petitioner's fee request seems to imply that heightened enforcement of the good faith and reasonable basis requirements as a discretionary matter should be viewed as a deterrent to the filing of petitions that are not intended for litigation in this Program. Apart from the fact that this petition was filed in good faith and with a reasonable basis, respondent's argument misses a fundamental point.

There is no debate that the "stepping stone" respondent criticizes – the filing of this petition – is an absolutely required, statutorily prescribed, prerequisite to petitioner's anticipated direct suit against the vaccine manufacturer. Thus, if future petitioners are intent on similarly forgoing no-fault resolution of their cases and filing suit directly against vaccine manufacturers, there is likely no deterrent effect to be had in this context and within this Program. Moreover, if these petitioners subjectively believe they

---

2019 WL 7908011, at *4 (Fed. Cl. Spec. Mstr. Dec. 31, 2019) (quoting *Santacroce, supra*, for the proposition that a special master must "focus on the requirements for a petition under the Vaccine Act" to determine what makes a claim feasible.) In some contexts, feasible can be understood to mean easily accomplished and/or probable or likely. However, in the context of a reasonable basis analysis, in which the applicable standard is necessarily lower than preponderant evidence, feasible may be better understood as merely possible. Such an interpretation would be consistent with the Federal Circuit's "more than a mere scintilla" language. *Cottingham*, 971 F.3d at 1346.

will succeed, then there will be a concomitant expectation among their counsel that this separate suit will provide an opportunity to earn attorneys' fees and costs outside the confines of this Program. It is unlikely then that any degree of parsimony regarding the merely preliminary attorneys' fees and costs generated within this Program could dissuade the filings respondent fears.

Conversely, respondent's suggestion that attorneys' fees and costs be withheld as a matter of discretion due to the fact of petitioner's withdrawal is likely to have the opposite of respondent's intended effect. As explained above, petitioners have one 30-day window in which to exit the Program after a special master issues the appropriate notice after 240 days. *See* 42 U.S.C. §300aa-21(b)(indicating "such notice shall be filed within 30 days of the provision of the notice required by section 300aa-12(g) of this title.") If a petitioner misses or foregoes that opportunity, then the only alternative is to press on far enough to achieve a judgment that can be rejected. If petitioners perceive that they are being penalized for their reliance on the 240-day withdrawal mechanism, then they may be incentivized to instead pursue judgment on the merits despite their clear intention to reject such judgment. Even if somewhat perfunctory, this longer process would result in even more work within the Program and even more outlay of attorneys' fees (and perhaps expert costs) from the Program than what already concerns respondent relative to the 240-day withdrawal.[11]

Vaccine Rule 10(d) provides that an order concluding proceedings in a withdrawn case should be viewed as a judgment for purposes of section 300aa-15(e) of the Vaccine Act, which in turn allows for an award of attorneys' fees and costs where there is good faith and a reasonable basis for the filing of the petition. Where respondent opposes good faith or reasonable basis on the merits in a given case, such argument warrants resolution. However, respondent is not persuasive in contending that any policy consideration warrants special consideration above and beyond that standard simply by virtue of the petitioner having invoked section 300aa-21(b) of the Vaccine Act.

### d. Amount of the Award

The determination of the amount of reasonable attorneys' fees is within the special master's discretion. *See, e.g.*, *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1520 (Fed. Cir. 1993). Special Masters have "wide latitude in determining the reasonableness of both attorneys' fees and costs." *Hines v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (Fed. Cl. 1991). Moreover, special masters are entitled to rely on their own experience and understanding of the issues raised. *Wasson v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 482, 483 (Fed. Cl. 1991) *aff'd in relevant part,* 988 F.2d 131 (Fed. Cir. 1993) (per curiam). Special masters can reduce a

---

[11] For example, in the above-discussed *McElerney* case, petitioner voluntarily dismissed the case after filing an expert report and then elected to reject judgment to file a civil action. In that case, petitioner was awarded $37,958.11 in attorneys' fees and costs. No. 16-1540V, 2020 WL 7366343 (Fed. Cl. Spec. Mstr. Nov. 2, 2020). In this case, petitioner initially sought only $15,712.81 in attorneys' fees and costs.

fee request *sua sponte*, without providing petitioners notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 209 (2009).

Although petitioner's withdrawing from the Program has not affected the fact of petitioner's entitlement to an award of attorneys' fees and costs, it could still potentially have a bearing on the amount of attorneys' fees and costs that can be considered reasonable under the specific circumstances of this case. That is, this case was necessarily truncated and there is reason to suspect petitioner never intended to receive a judgment on the merits. In particular, the first billing entry in counsels' record indicates: "Extended call with new client; VICP process; underlying facts giving rise to possible claim; ability to opt out and sue Merck directly." (ECF No. 29-1, p. 1.) I directed petitioner to address this question in his motion reply. (ECF No. 31, p. 2.) Specifically, I instructed petitioner to "address the further question whether the entirety of counsel's hours are reasonably billed to this Program in light of his apparent intention not to seek a decision on the merits within the Program." (*Id.*)

In response, petitioner represented that, although he was aware of the possibility of initiating suit against the vaccine manufacturer, he did not make the determination to exit the Vaccine Program and pursue that option until March 18, 2021. (ECF No. 33, p. 8.) Counsel cites his own contemporaneous billing entry "Call with client re: 240-day notice and opting out." (*Id.* citing (ECF No. 29-1, p. 3).) Petitioner's counsel explains that not all of his similarly situated clients have opted to forgo judgment in this Program. (ECF No. 33, pp. 8-9.) The billing record cited by counsel is far from definitive evidence of petitioner's intentions; however, I agree that the implication of this representation is that substantive work during the pendency of this case was warranted and reasonable because petitioner's abandonment of his claim within the Program was not inevitable.

Nonetheless, I remain concerned that the hours billed in this case remain high in comparison to what was actually accomplished. Counsel filed the petition in this case only days after his initial July 13, 2020 client intake (*see* ECF No. 29-1, p. 1) and it was pending for only about 240 days. In that time, the case never moved beyond the collection of medical records. Moreover, the medical records did not require any unusual or extraordinary effort to obtain. Petitioner never filed any motion for authority to issue any subpoena in this case. Accordingly, even accepting petitioner's representation that he was substantively pursuing his claim on the merits during those 240 days, the progress and activity that occurred in this case does not substantiate total attorneys' fees of $14,174.00. In other, albeit potentially less complicated cases, other attorneys charging comparable rates have been able to collect and review medical records, fully analyze the claim(s) at issue, and, in fact, negotiate and entirely resolve cases, while charging attorneys' fees comparable to those billed here only for initial record collection and review. *See Marts v. Sec'y of Health & Human Servs.*, No. 18-1845V, 2020 WL 7417300 (Fed. Cl. Spec. Mstr. Nov. 17, 2020) (entirely resolving a case via stipulation in under two years and requesting $15,819.20 in attorneys' fees); *Weaver v. Sec'y of Health & Human Servs.*, No. 18-1742V, 2020 WL 7405506 (Fed. Cl. Spec. Mstr. Nov. 17, 2020) (entirely resolving a case via stipulation in under two years

15

and requesting $14,474.80 in attorneys' fees); *Wingard v. Sec'y of Human & Health Servs.*, No. 19-45V, 2020 WL 5821075 (Fed. Cl. Spec. Mstr. Aug. 28, 2020) (entirely resolving the case in one year and three months via proffer and requesting $14,512.70 in attorneys' fees).

This conclusion is further underscored by my review of the billing records. I find that counsel included entries that are duplicative and excessive due to attorneys and paralegals reviewing/receiving the same medical records and orders, especially, Danielle Avery, paralegal, who has been previously cautioned regarding her billing for non-substantive analysis of medical records. *See Mulrenin v. Sec'y of Health & Human Servs.*, No. 18-22V, 2020 WL 7868230 (Fed. Cl. Spec. Mstr. Dec. 10, 2020). Along with billing for "analysis of medical records received … to determine begin and end date of records," Ms. Avery also included as part of her block billing that she proceeded to prepare such records for filing; however, at a later date, Ms. Avery would bill again for "prepare medical records for filing with the Court." (*See, e.g.*, ECF No. 29-1, p. 6.) Such billing is duplicative and excessive. Special masters have previously reduced the fees paid to petitioners due to excessive and duplicative billing. *See Ericzon v. Sec'y of Health & Human Servs.*, No. 10-103V, 2016 WL 447770 (Fed. Cl. Spec. Mstr. Jan. 15, 2016) (reduced overall fee award by 10 percent due to excessive and duplicative billing); *Raymo v. Sec'y of Health & Human Servs.*, No. 11-654V, 2016 WL 7212323 (Fed. Cl. Spec. Mstr. Nov. 2, 2016) (reduced overall fee award by 20 percent), *mot. for rev. denied*, 129 Fed. Cl. 691 (2016).

Ms. Avery also billed for administrative tasks such as filing documents and receiving/reviewing invoices for medical records. (*See, e.g.*, ECF No. 29-1, p. 8.) In the Vaccine Program, secretarial work should be considered as normal overhead office costs and therefore, billing for clerical and other secretarial work is not permitted. *Mostovoy v. Sec'y of Health & Human Servs.*, No. 02-10V, 2016 WL 720969, at *5 (Fed. Cl. Spec. Mstr. Feb. 4, 2016) (citing *Rochester v. United States*, 18 Cl. Ct. 379, 387 (1989). This issue has also been raised with this firm before. *See McElerney v. Sec'y of Health & Human Servs.*, No. 16-1540V, 2020 WL 7366343, at *3 (Fed. Cl. Spec. Mstr. Nov. 2, 2020).

In light of the scope of the specific work performed in this case and the above-discussed billing issues, I find that a 20% reduction to the attorneys' fees billed in petitioner's first motion is appropriate. This results in a reduction of **$2,834.80**.

With regard to petitioner's application for supplemental fees relative to his reply brief, I find that these hours were reasonably billed given that the issues discussed herein appear to be arising for the first time. The arguments presented by respondent's response were novel and petitioner's reply helpful. However, I cannot agree with petitioner's assertion that respondent's arguments warranted petitioner's billing for


research into sanctions. Accordingly, petitioner's supplemental attorneys' fees and costs are reduced by **$346.50**.

I have also reviewed petitioner's submission with regard to his requested costs.[12] The costs incurred were all reasonable and are sufficiently documented. Accordingly, the requested amount is awarded in full.

### VI. Conclusion

In light of the above, petitioner's motion for an award of final attorneys' fees and costs (ECF No. 29) and petitioner's supplemental motion for an award of final attorneys' fees and costs (ECF No. 34) are hereby **GRANTED** and petitioner is awarded $17,228.51, representing $15,689.70 in attorneys' fees and $1,538.81 in attorneys' costs.

**Accordingly, I award a total of $17,228.51 as a lump sum in the form of a check payable to petitioner and his counsel, Andrew Donald Downing, Esq.**

The clerk of the court shall enter judgment in accordance herewith.[13]

**IT IS SO ORDERED.**

> **s/Daniel T. Horner**
> Daniel T. Horner
> Special Master

---

[12] Respondent indicates that petitioner submitted a bill for $306.25 from CIOX Health for 279 pages of records from J.F.K. Medical Center, but respondent cannot confirm that such records were filed in their entirety. (ECF No. 35, p. 3; *see also* ECF No. 29-1, p. 29.) It is not clear why that invoice references 279 pages of records; however, petitioner did file 2,885 pages of records from J.F.K. Medical Center pursuant to petitioner's Notice of Intent to File on CD. (*See* ECF No. 17; Ex. 14.)

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.